## In re FRANKLIN SIGNAL CORPORATION, Debtor.

**Bankruptcy No. 4–85–935.**

United States Bankruptcy Court, D. Minnesota.

Sept. 29, 1986.

Linn J. Firestone, Minneapolis, Minn., in pro. per.

John A. Hedback, Minneapolis, Minn., for U.S. trustee.

Thomas L. Dosch, Asst. Atty. Gen., Madison, Wis., for State of Wis.

Richard J. Harden, Minneapolis, Minn., for Creditors' Committee in the former Chapter 11 case.

Thomas R. Schumacher, New Richmond, Wis., for Bank of Clear Lake.

Rosanne H. Wirth, Minneapolis, Minn., for Shelard Companies, Inc.

David T. Coriden, for Impact Seven, Inc.

David Gronbeck, Minneapolis, Minn., for debtor.

## ORDER APPROVING ABANDONMENT

ROBERT J. KRESSEL, Bankruptcy Judge.

This case came on for hearing on the trustee's motion under 11 U.S.C. § 554 for abandonment of fourteen drums of various chemicals. A hearing was held on August 27, 1986. John A. Hedback appeared for the United States Trustee; Thomas L. Dosch appeared for the State of Wisconsin; Richard J. Harden appeared for the Creditors' Committee in the former Chapter 11 case; Thomas R. Schumacher appeared for the Bank of Clear Lake; Rosanne H. Wirth appeared for Shelard Companies, Inc.; David T. Coriden appeared for Impact Seven, Inc.; and David Gronbeck appeared for the debtor. The trustee, Linn J. Firestone, appeared *in propria persona*. This court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Based on the evidence, memorandum and arguments of counsel, and the file of this case, I make the following:

## MEMORANDUM ORDER

### FACTS

The debtor, Franklin Signal Corporation, manufactured and sold burglar alarm systems in Clear Lake, Wisconsin. The manufacturing plant was leased from Impact Seven Corporation. On May 13, 1985, Franklin Signal Corporation filed a voluntary Chapter 11 petition. The case was converted to Chapter 7 on October 4, 1985, and Linn J. Firestone was appointed trustee.

Prior to filing its petition, the debtor generated fourteen drums of waste. The trustee paid Bay West, Inc. $500 to investigate the contents and condition of the drums and make a report. The report concluded that the drums were in fair to poor condition, and contained several different chemicals, including: soldering oil and flux, hydroxyacetic acid, thinner, and trichlorothene. At least one of these chemicals, trichlorothene, constitutes hazardous waste under Wisconsin law.[1]

The drums and most of the estate's assets were subject to liens in excess of $268,000 held by the Bank of Clear Lake. On December 11, 1985, I approved the sale of certain assets for $34,000. The Bank's liens attached to the proceeds of the sale. The trustee paid $20,000.00 of the proceeds to the Bank and by order of September 2, 1986, I authorized the trustee to pay the Bank the remaining $14,000 less commissions and expenses of the sale.

The remainder of the estate consists of approximately $10,000 in unencumbered cash, the fourteen drums of waste, and two apparently uncollectible promissory notes

---

**1.** The State of Wisconsin Department of Natural Resources has been informed of the situation. To date, however, no one has assumed responsibility for the hazardous waste or incurred any cost in disposing of the fourteen drums. The logical inference of the State's inaction is that the drums do not pose any imminent threat to the public.

from the debtor's officers for $75,000. Essentially, the estate has $10,000 to pay claims well in excess of that amount. Moreover, there are at least $17,652 in administrative expenses and the trustee estimates that the cost of removing the hazardous waste will be $20,000. The trustee filed his motion to obtain approval to abandon the fourteen drums, or in the alternative, to determine how the hazardous waste cleanup will be funded.

## DISCUSSION

The issue presented in this case is whether a trustee in a Chapter 7 case can abandon hazardous waste pursuant to 11 U.S.C. § 554 if the estate does not have the necessary funds to comply with state environmental laws. The conflict between the Bankruptcy Code and state environmental laws has received a great amount of attention in recent years. Under 11 U.S.C. § 554(a) "the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." The underlying purpose of abandonment is to enable the trustee to efficiently reduce the debtor's property to money for distribution to creditors. *See* 4 L. King, *Collier on Bankruptcy,* ¶ 554.01 (15th ed.1985). In most situations, abandonment is uncontroversial because it does not adversely affect any interested parties. With respect to property burdened by hazardous waste, however, the bankruptcy court's power to authorize an abandonment has come under close scrutiny.

Most recently, the Supreme Court addressed the issue in *Midlantic National Bank v. New Jersey Department of Environmental Protection,* — U.S. —, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). In *Midlantic,* the debtor processed waste oil contaminated with polychlorinated biphenyls (PCB's). The New Jersey Department of Environmental Protection found the debtor's operations in violation of state environ-

mental laws and ordered the debtor to cease production. The debtor filed a petition under Chapter 11. When it appeared that reorganization was impossible, the case was converted to Chapter 7. After trying unsuccessfully to sell the debtor's New York and New Jersey facilities, the trustee moved to abandon the property under § 554(a).[2] The bankruptcy court granted the trustee's motion.

On review, the United States Supreme Court held that "a trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Id.,* 106 S.Ct. at 762. Based on past case law, the Court reasoned that Congress did not intend to grant the trustee unlimited abandonment power.

> [W]hen Congress enacted § 554, there were well-recognized restrictions on a trustee's abandonment power. In codifying the judicially developed rule of abandonment, Congress also presumably included the established corollary that a trustee could not exercise his abandonment power in violation of certain state and federal laws. The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.... Although these cases do not define for us the exact contours of the trustee's abandonment power, they do make clear that this power was subject to certain restrictions when Congress enacted § 554(a).

*Id.* at 759–60. In a stinging dissent, Justice Rehnquist criticizes the five-judge majority for imposing conditions on the abandonment power that Congress never contemplated.

> I remain unconvinced by the Court's arguments supporting state power to bar abandonment. The principal and only independent ground offered—that Con-

2. Both facilities were found to be a burden to the estate because the outstanding mortgages and cost of bringing the property in compliance with state environmental laws far exceeded their value.

gress codified "well-recognized restrictions on a trustee's abandonment power" —is particularly unpersuasive. It rests on a misreading of three pre-Code cases, the elevation of that misreading into a "well-recognized" exception to the abandonment power, and the unsupported assertion that Congress must have meant to codify the exception (or something like it). The specific shortcomings in the Court's analysis ... stem at least in part from the Court's failure to discuss even in passing either the nature of abandonment or its role in federal bankruptcy.

*Id.* at 763 (Rehnquist, J., dissenting).

█ Read literally, the Supreme Court's decision in *Midlantic* would bar a trustee from abandoning any property if the abandonment would violate a state law designed to protect the public health and safety. However, I do not believe that this strict reading of the Court's decision is a desirable result or, in fact, what the majority intended to hold. The trustee in *Midlantic* took no action at all to safeguard the public from the great danger created by the conditions at the two processing facilities. This total disregard for potential hazards is the concern the majority seemed to be addressing.

> The trustee was not required to take even relatively minor steps to reduce imminent danger, such as security fencing, drainage and diking repairs, sealing deteriorating tanks, and removing explosive agents. Moreover, the trustee's abandonment at both sites aggravated already existing dangers by halting security measures that prevented public entry, vandalism, and fire. The 470,000 gallons of highly toxic and carcinogenic waste oil in unguarded, deteriorating containers "present risks of explosion, fire, contamination of water supplies, destruction of natural resources, and injury, genetic damage, or death through personal contact."

*Midlantic,* 106 S.Ct. at 758, n. 3. (citations omitted) I believe the Supreme Court intended only to place limits on a trustee's power of abandonment by holding that the bankruptcy court cannot authorize the abandonment of property in contravention of state law *unless* conditions are formulated that will adequately protect the public health and safety. *See Midlantic,* 106 S.Ct. at 762. *See also In re Oklahoma Refining Co.,* 63 B.R. 562 (Bktcy.W.D.Okl. 1986).

This less restrictive view of *Midlantic* is consistent with the Supreme Court's earlier decision in *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985).[3] Elaborating on a trustee's duty in Chapter 7, the Court noted:

> After notice and hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate. 11 U.S.C. § 554. Such abandonment is to the person having the possessory interest in the property. S.Rep.No. 95–989, p. 92 (1978). Property that is scheduled but not administered is deemed abandoned. 11 U.S.C. § 554(c). Had no [state] receiver been appointed prior to Kovacs' bankruptcy, the trustee would have been charged with the duty of collecting Kovacs' nonexempt property and administering it. If the site at issue were Kovacs' property, the trustee would shortly determine whether it was of value to the estate. If the property was worth more than the cost of bringing it into compliance with state [environmental] law, the trustee would undoubtedly sell it for its net value, and the buyer would clean up the property, in which event whatever obligation Kovacs might have had to clean up the property would have been satisfied. If the property were worth less than the cost of cleanup, the trustee would likely abandon it to its prior owner, who would have to comply with the state environmental law to the extent of his or its ability.

*Kovacs,* 105 S.Ct. at 711, n. 12. Although the quoted statement is *dicta* in the *Kovacs* case, it lends guidance to understanding

---

**3.** In *Kovacs,* the Court held that the debtor's obligation to comply with a state court order requiring it to clean up hazardous waste was a debt subject to discharge in a bankruptcy case.

the Supreme Court's holding in *Midlantic.* The trustee only needs to take adequate precautionary measures to ensure that there is no imminent danger to the public as a result of abandonment.[4]

The next question, then, is under what conditions may a bankruptcy court approve abandonment of hazardous waste. There obviously is no set answer to this question since the conditions must be formulated on a case-by-case basis. However, I believe at least five factors must be considered: (1) the imminence of danger to the public health and safety, (2) the extent of probable harm, (3) the amount and type of hazardous waste, (4) the cost to bring the property into compliance with environmental laws, and (5) the amount and type of funds available for cleanup. Considering these factors in setting the conditions for abandonment will effectively balance the competing interests. In fact, this case-by-case approach provides a more feasible solution to the underlying problem, as opposed to applying a strict reading of *Midlantic.* [5]

## APPLICATION

As a result of the *Midlantic* decision, a threshhold question in all actions under 11 U.S.C. § 554 is whether abandonment would contravene a state law designed to protect the public health and safety. The State of Wisconsin alleges that the trustee's abandonment of the fourteen drums would violate Wis.Stat. §§ 144.60–144.74 (Supp.1985) (Hazardous Waste Management Act) and Wis.Admin.Code §§ N.R. 181.21 and N.R. 181.22 (1985). After reviewing these sections, I have serious doubts that abandonment in this case would contravene Wisconsin law. The major thrust of the Hazardous Waste Management Act is on the reporting of potential danger and the licensing of hazardous waste facilities. The provisions deal primarily with generators of hazardous waste and licensed facilities in the business of treating and storing hazardous substances.[6] The State has not cited any statutory or case law establishing that a bankruptcy trustee who is not generating waste or operating a treatment facility falls within the provisions of the Act.[7]

■ There are, however, two sections which arguably apply to a Chapter 7 trustee. Under Wis.Stat. § 144.64(2)(a), "no person may store or cause the storage of

---

4. In *In re Oklahoma Refining Co.,* 63 B.R. 562 (Bktcy.W.D.Okla.1986), the court stated that the bankruptcy court need only "take state environmental laws and regulations into consideration." 63 B.R. at 565. I believe that the *Midlantic* decision requires something more than mere consideration of state law, but something less than complete compliance.

5. In some cases, a strict application of the *Midlantic* holding is not practical, or even possible. For example, in a Chapter 7 no-asset case the trustee is rendered helpless. On the one hand, the trustee has no funds—secured or unsecured—to pay for the hazardous waste cleanup. On the other hand, the court cannot authorize an abandonment under § 554(a) if it would contravene state environmental laws. The ironic quirk in a strict application of *Midlantic* is that the property would ultimately be abandoned by default pursuant to 11 U.S.C. § 554(c). That section provides: "any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." *Id.* Because a strict application of *Midlantic* would simply side-step the problem, it is entire-

ly logical to conclude that the majority did not intend such a result. *See also In re Oklahoma Refining Co.,* 63 B.R. 562 (Bktcy.W.D.Okl.1986) for another dilemma that would result from a strict reading of *Midlantic.*

6. Generation of hazardous waste is defined as "the act or process of producing hazardous waste but does not include any manufacturing process." Wis.Stat. § 144.61(4) (Supp.1985). Hazardous waste facility is defined as "a facility for the treatment, storage or disposal of hazardous waste and includes the land where the facility is located." Wis.Stat. § 144.61(5m) (Supp. 1985).

7. It is interesting to note that Wisconsin law provides a "contingency plan" to clean hazardous substance spills. *See* Wis.Stat. § 144.76(5). Moreover, Wis.Stat. § 144.76(6) authorizes the use of state funds to carry out these contingency operations. Apparently, the State of Wisconsin has anticipated that in certain instances the public will be responsible for hazardous waste cleanup.

hazardous waste in a manner which causes environmental pollution." While this section deals with licensing requirements in general, it may be fairly read to impose a duty on the trustee to comply with state environmental laws. Likewise, § 144.76(3) provides:

> a person who possesses or controls a hazardous substance which is discharged or who causes the discharge of a hazardous substance shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands or waters of this state.

Wis.Stat. § 144.76(3) (1985). Thus, although it is not entirely clear, I believe abandonment by the trustee in this case could be in violation of state laws that are designed to protect the public health and safety.

The next issue to resolve is whether an abandonment should be approved and if so, what conditions are necessary to protect the public health and safety. Pursuant to 11 U.S.C. § 554(a) a trustee may abandon property that is of "inconsequential value" to the estate. The property at issue in this case is fourteen drums of various chemicals that clearly are not of value to the bankrupt estate. Rather, the drums are a liability to the estate. They have no determinable market value and it would cost approximately $20,000 to remove them from the leased premises. Under these circumstances, abandonment by the trustee is appropriate. *See, e.g., In re Union Scrap Iron & Metal Co.,* 49 B.R. 477 (Bktcy.D.Minn.1985); *In re A & T Trailer Park, Inc.,* 53 B.R. 144 (Bktcy.D.Wyo. 1985).

The more difficult question is what conditions on abandonment are mandated by the Supreme Court's decision in *Midlantic. Midlantic* imposes a duty on the trustee to take at least minimal steps to protect the public until an abandonment is authorized.

These intermediate measures may include: hiring an environmental specialist to assess the situation, sealing storage tanks to prevent discharge, or fencing off the contaminated area to prohibit public access.

At a minimum, I believe that *Midlantic* requires that the trustee comply with two conditions before abandoning property contaminated with hazardous waste. First, the trustee must conduct an investigation to determine what hazardous substances, if any, burden the property.[8] Second, the trustee must inform the appropriate state and federal agencies of the situation, including the trustee's intent to abandon. Any other conditions the bankruptcy court may formulate will depend on the facts of the particular case in light of the factors set forth earlier.

In this case, the trustee took several precautionary measures before moving to abandon the property. The trustee contracted with Bay West, Inc., an environmental specialist, to determine the exact contents of the fourteen drums and to estimate the cost of cleanup. Once the preliminary investigation confirmed that the drums were contaminated, the trustee reported the matter to the Wisconsin Department of Natural Resources. Thus, the trustee has met the minimum conditions for abandonment under the *Midlantic* decision.

As to any further conditions, I do not believe that the facts of this case warrant other restrictions be placed on the trustee's abandonment. There is no evidence of any imminent danger in the storage of the fourteen drums until such time that the party ultimately responsible for the cleanup can be determined. The drums are undoubtedly an inconvenience to the landlord and a concern to the state, but they are not an impending threat to the public health and safety.

---

**8.** This condition does not require a trustee to investigate all property subject to abandonment. It is only when the trustee reasonably believes that an abandonment would violate state environmental laws that a preliminary investigation is required. Furthermore, the trustee does not necessarily have to employ an independent investigator to determine if the property is contaminated. Any reasonable means of investigation is permissible.

Examination of the five factors listed above confirms this conclusion. There are only fourteen drums of chemicals totalling approximately 400 gallons of contaminated waste. Even though the drums are in deteriorating condition, they are not a threat to public safety. The State of Wisconsin has been informed of the situation from the outset, and has not found it necessary to take any further precautionary measures.[9] Even if *Midlantic* dictates complete compliance with state law, the trustee would not have the requisite funds. The estate currently has $10,000 in unencumbered cash. The trustee already has spent $500 of estate funds for the environmental report, and it would cost approximately $20,000 for the initial cleanup. Under the circumstances, an abandonment is appropriate.

A final point to address is the effect of abandonment. Under 11 U.S.C. § 554, abandonment divests the property from the estate. Ownership and control of the asset is reinstated in the debtor with all rights and obligations as before filing a petition in bankruptcy. *See, e.g., Bennett v. Commercial Credit Plan*, 13 B.R. 643 (Bktcy. D.Mich.1981); *Riggs National Bank v. Perry*, 29 B.R. 787 (Bktcy.D.Md.1983), *aff'd*, 729 F.2d 982 (4th Cir.1984); *In re Cruseturner*, 8 B.R. 581 (Bktcy.D.Utah 1981). As a result, the fourteen barrels of waste become Franklin Signal Corporation's property, subject to the security interest held by the Bank of Clear Lake.

With respect to the continuing violation of state environmental laws, it seems that several parties have an interest in disposing of the waste. The State of Wisconsin, the debtor, the landlord, and perhaps the debtor's officers and directors may be responsible for the cleanup. The determination of who may be ultimately liable and whether that individual or entity has a claim against the estate present interesting questions; however, these issues need not

be addressed until presented. No party has assumed responsibility or incurred any cost in disposing of the hazardous waste. The sole issue presented in this case is whether the trustee can abandon the drums of hazardous waste.

THEREFORE, IT IS ORDERED: The trustee's abandonment of the fourteen drums of hazardous waste is approved.

---

**9.** It is important to compare the facts of this case to those in *Midlantic*. The property at issue in *Midlantic* contained 470,000 gallons of highly toxic and carcinogenic waste which presented risks of explosion, fire and death. *Midlantic National Bank v. New York Department of Environmental Protection*, —— U.S. ——, 106 S.Ct. 755, 758 n. 3, 88 L.Ed.2d 859 (1986). This case is not nearly as alarming with respect to the amount and type of waste. The issue here is not one of public safety but one of money; who must bear the cost of cleanup.